# U.S. COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 25-2911

JIAHERB, INC.
*Appellant*

v.

MTC INDUSTRIES, INC.

---

Appeal from U.S. District Court, D.N.J.
Judge Katharine S. Hayden
No. 2:18-cv-15532

Before: BIBAS, CHUNG, and MASCOTT, *Circuit Judges*
Submitted Under Third Circuit L.A.R. 34.1(a) on June 25, 2026
Decided: July 24, 2026

---

NONPRECEDENTIAL OPINION[*]

CHUNG, *Circuit Judge*.  Jiaherb, Inc. brought suit alleging that saw palmetto oil purchased from MTC Industries, Inc. ("MTC") was adulterated.  After a four-day bench trial, the District Court concluded that the saw palmetto oil in question satisfied the standard set by the contract, and was not otherwise adulterated.  Thus, it entered judgment in MTC's favor and dismissed Jiaherb's amended complaint.  For the reasons set forth below, we will affirm.

## I.  BACKGROUND[1]

---

[*]    This disposition is not an opinion of the full Court and, under I.O.P. 5.7, is not binding precedent.

[1]    Because we write for the parties, we recite only the facts pertinent to our decision.

Jiaherb, Inc., sells dietary supplement ingredients. Between January 2017 and February 2018, Jiaherb bought 17,266 kilograms of saw palmetto oil from MTC. Jiaherb's orders were fulfilled from six discretely labeled batches, only two of which are in question.[2] The parties did not execute a unified contract. Rather, Jiaherb sent MTC a series of purchase orders, requesting various quantities of saw palmetto oil. Upon receipt, MTC responded by sending samples of its product, along with certificates of analysis ("COAs") detailing the samples' specifications. Jiaherb then conducted its own quality testing and, if results were satisfactory, confirmed its order. MTC then fulfilled the purchase orders.

The purchase orders included only one term related to the quality of product: "Saw Palmetto Oil | Fatty Acids 85% GC." A900-06. The COAs reported that the accompanying batches were in compliance with "USP 36" or with "USP 37."[3] A917-28. The invoices stated: "All customers are responsible for confirming quality and quantity. Any discrepancies must be reported to MTC Industries within 7 days of receipt." A908-15.

USP publishes standards for various dietary supplement ingredients. To meet USP standards at the time of these events,[4] saw palmetto oil had to have, among other things, a

---

Moreover, to the extent that they are not challenged on appeal, we rely on the factfindings of the District Court.

[2]  These batches were numbered 161112-2 and 170425.

[3]  USP is an abbreviation for "United States Pharmacopeia." As witnesses on both sides testified, the industry standard for saw palmetto oil is set by USP.

[4]  The District Court concluded, and the parties do not dispute, that USP 37—a standard discussed over the course of trial—was the governing standard for the contested batches.

2

total fatty acid content of 85% as measured by a technique called gas chromatography ("GC"). More specifically, GC had to reflect specific percentages of ten different fatty acids, as well as a certain ratio of lauric acid to individual fatty acids.

Witnesses from both companies testified at trial that every batch sold by MTC to Jiaherb underwent multiple rounds of testing by each party. Here, both batches satisfied GC testing, demonstrating over 85% fatty acid content and the correct acid profile by the USP standard. Based on these results, Jiaherb began reselling the saw palmetto oil it purchased from MTC to its own customers.

Approximately ten months after receiving shipment from MTC, however, Jiaherb's customer Natural Factors sought to cancel its order due to adulteration. Natural Factors had hired Isura laboratories to perform a different form of analysis called nuclear magnetic resonance ("NMR") testing on the product. According to Natural Factors, NMR testing revealed that samples from two batches did not meet quality standards. In response, Jiaherb secured two additional third-party tests: (1) its own NMR testing by Isura; and (2) GC testing by Eurofins laboratories. Isura issued NMR testing reports that both batches showed possible adulteration with coconut oil. Based on the results, Jiaherb sought to return to MTC 2,847.5 kilograms of saw palmetto oil that it still had in stock in exchange for its money back—a total of around $385,000. After an internal investigation, MTC rejected Jiaherb's request. The underlying litigation ensued.

Jiaherb's amended complaint included seven counts, three of which are appealed here: Count 1, alleging false advertising in violation of the Lanham Act; Count 3, alleging breach of contract; and Count 4, alleging breach of the implied covenant of good faith and fair

3

dealing. The case proceeded to a four-day bench trial, after which the District Court entered judgment in MTC's favor and dismissed Jiaherb's amended complaint. Jiaherb timely filed a notice of appeal. Jiaherb's claims on appeal revolve around one central dispute: whether the oil it was sold met quality standards under the parties' contract.

## II. DISCUSSION[5]

### A. The District Court did not Err in Entering Judgment for MTC on the Breach of Contract Claim

#### 1. The District Court did not Clearly Err in Interpreting the Contract

We review a district court's contract interpretation for clear error as a question of fact, and its contract construction de novo as a question of law. *In re Nat'l Collegiate Student Loan Trs. 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, 2005-3*, 971 F.3d 433, 443 (3d Cir. 2020). In determining the nature of the district court's analysis, we ask whether the court sought to ascertain a term's meaning (interpretation) or its legal effect (construction). *See id.* If the contract language is ambiguous, then we review the district court's interpretation. *Garden State Tanning, Inc. v. Mitchell Mfg. Grp., Inc.*, 273 F.3d 332, 335 (3d Cir. 2001). If it is unambiguous, we review the court's construction. *Id.* At the outset, we consider de novo whether the language is ambiguous. *Wayne Land & Min. Grp. LLC v. Del. River Basin Comm'n*, 894 F.3d 509, 528 (3d Cir. 2018).

---

[5] The District Court had jurisdiction over the Lanham Act claim pursuant to 28 U.S.C. §1331, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. Following a bench trial, we review a district court's findings of fact for clear error, its legal conclusions de novo, and its evidentiary rulings for abuse of discretion. *Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 156-57 (3d Cir. 2010).

The purchase orders, which the parties agree form part of their contract, specified the sale of: "Saw Palmetto Oil | Fatty Acids 85% GC." A900-06. Jiaherb's quality control manager acknowledged at trial that the purchase orders only called for GC testing, but it argued that "saw palmetto oil" means that the product must be "pure" and "unadulterated," independent of the USP standards. Implicitly, Jiaherb argues that if other testing reveals adulteration, the contract term is violated. On appeal, it argues that the USP itself dictates as much, based on a "prohibition on added oils." Opening Br. at 25.

We conclude that the contract term is ambiguous. The term itself offers no explanation as to whether it requires anything besides "85% fatty acids by GC"; nor does it elaborate on that method. Thus, neither party's interpretation is unreasonable, *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008), and the District Court's task was contract interpretation subject to clear error review.

Clear error occurs if the District Court's factual finding is "completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." *Berg Chilling Sys., Inc. v. Hull Corp.*, 369 F.3d 745, 754 (3d Cir. 2004) (quoting *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 353 (3d Cir. 2002)). In interpreting the contract language, the court reasoned:

> Jiaherb's purchase orders—the operative contracts—require MTC's saw palmetto oil to contain "Fatty Acids 85% GC." (J8, J9, J10, J11.) This terminology means that the product must contain at least 85% fatty acids *as determined by the GC testing method*.

A33 (emphasis in original). To reach this conclusion, the court relied on testimony by Jiaherb's CEO and its quality control manager. Jiaherb's CEO testified that the only

5

"purity" term was for MTC to provide "saw palmetto oil with fatty acids of not less than 85 percent, as confirmed by gas chromatography." A175-76. And Jiaherb's quality control manager confirmed, on cross examination, that both the USP and the parties' contract only required testing by gas chromatography. We further note that the language of the contract itself supports the District Court's interpretation, because reading "Fatty Acids 85% GC" to require confirmation of purity by other testing methods would render the "GC" in "85% GC" superfluous. *See Wash. Const. Co. v. Spinella*, 84 A.2d 617, 619 (N.J. 1951) ("Individual clauses and particular words must be considered in connection with the rest of the agreement, and all parts of the writing and every word of it will, if possible, be given effect." (quoting 9 Williston on Contracts (Rev. ed.), sec. 46, p. 64)). Therefore, the District Court's conclusion has evidentiary support that the contract required no other quality testing to ensure the lack of adulteration, and we perceive no clear error.[6]

2. The District Court's Evidentiary Rulings were not an Abuse of its Discretion or Plain Error

Jiaherb argues that the District Court abused its discretion in allowing Dr. Poguang Wang to testify as an expert. Under Rule 702 of the Federal Rules of Evidence, a witness must be qualified, and their opinion must be both relevant and reliable, before he or she testifies as an expert. *United States v. Anderson*, 171 F.4th 232, 236 (3d Cir. 2026).

---

[6] Jiaherb also appears to challenge the District Court's view that the purchase orders comprised the entire contract, and insists that the COAs imposed compliance with USP 37 as an additional contract term. But this argument has no impact on the analysis here as, just like the purchase orders, USP 37 only called for GC as the testing method for authenticating saw palmetto oil.

Reliability turns on multiple factors, including methodology. *See id.* Jiaherb disclaims any challenge to Dr. Wang's qualifications, and instead focuses on relevance—also known as "fit," *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000)—and methodology. Only fit was challenged at trial, and so we review the methodology issue for plain error. *United States v. Kolodesh*, 787 F.3d 224, 234 n.12 (3d Cir. 2015).

As to fit, Jiaherb challenges Dr. Wang's lack of specific credentials in botanical adulteration. The court carefully considered Dr. Wang's qualifications as they pertained to the method of testing at issue (NMR), rather than botanical adulteration specifically. After provisionally admitting the testimony, the court concluded that Dr. Wang's testimony adhered closely to the subject of NMR testing, and was a good fit for the dispute over whether Isura's report should be credited. The court did not abuse its discretion in doing so.

As to methodology, Jiaherb complains that Dr. Wang's testimony only consisted of *critiques* of the analysis of its expert, James Kababick, and did not include Dr. Wang's own independent analysis. This argument is misplaced: as to every claim that Jiaherb appeals, it had the burden to prove that adulteration occurred, and MTC was not required to supply an independent analysis. It sufficed for Dr. Wang to explain why Isura's report did not demonstrate adulteration, and why Kababick's interpretation of the figures in that report was flawed.

Jiaherb raises another evidentiary issue: the "asymmetrical evidentiary treatment" of its Eurofins lab report and MTC's lab reports. Opening Br. at 21. MTC's lab reports, prepared ahead of the underlying dispute, were admitted into evidence as business records via

7

testimony by MTC's General Manager, Jimmy Wang.[7]  In contrast, Jiaherb's Eurofins report was not offered into evidence.  Jiaherb nevertheless argues that, because MTC and Jiaherb's reports were of the same type, its own report should have also been admitted.  To the extent that Jiaherb suggests that the District Court had a duty to admit the report *sua sponte*, it cites no rule of evidence for this proposition.  Even if there were some rule calling for admission, despite Jiaherb's failure to offer the report, nothing in the record supports the conclusion that the reports were admissible.  Jiaherb does not allege that its Eurofins report meets the criteria of the business records (or any other) hearsay exception.  We cannot agree with Jiaherb that the District Court abused its discretion by relying on the rules of evidence in determining admissibility.  Nor did the court plainly err, as Jiaherb must show due to its failure to preserve the issue.  *See* F. R. Evid. 103(a), (e).

3. <u>The District Court did not Clearly Err in Finding that Quality Standard was Satisfied and the Product was not Otherwise Adulterated</u>

Jiaherb asserts multiple reasons that the District Court committed clear error in finding that the subject batches were not adulterated.  Jiaherb argues that the District Court's decision to assign different weight to the experts' testimony caused it to clearly err.  The District Court heard the parties' experts testify about Isura's NMR testing as well as its June 7, 2018 report.[8]  For Jiaherb, Kababick testified that, despite the samples' satisfaction

---

[7]  Jiaherb's Isura reports were admitted into evidence as business records, via an Isura witness.

[8]  To understand the District Court's credibility determination, it is useful to know that NMR testing produces visual data called "spectra," displayed in a line-graph format, which

8

of regular GC testing, Isura's NMR testing and GC testing by Eurofins revealed adulteration by coconut oil or some other triglyceride-rich oil. Reviewing the Isura Report, Kababick relied wholly on a visual comparison of the spectra from the June report. Looking at perceived differences in value at perceived identical points on the graphs, without referring to the actual numerical values represented at those points (such values having not been provided by Isura), Kababick opined that the tested products contained added coconut oil. He further opined that the Eurofins GC data, which was not itself in evidence, also supported his conclusion. Kababick explained that, based on a type of GC testing called "free fatty acids" testing, Eurofins' data showed that the ratio of lauric and palmitic acid did not meet USP 37 standards. A319.

For MTC, Dr. Wang opined that the type of NMR testing conducted by Isura is not suitable for saw palmetto oil, unless it is supplemented by principal component analysis. Dr. Wang also highlighted numerous errors within Kababick's assessment of the NMR analysis. He explained that visual comparison was an imprecise tool for understanding the NMR results, given that the instrument used by Isura was capable of providing a digital file with the actual data represented in the spectra. Dr. Wang further noted that: the figure data was on its face incomplete, as the peaks in the spectra of Figure 1 of the Isura report

---

include peaks indicative of a substance's chemical properties.

We note as well that the June 17, 2018 report included analysis for batch 170425. A different report by Isura laboratories, dated February 20, 2018, analyzed batch 161112-2. That report was admitted into evidence, but was not the subject of Jiaherb's expert testimony.

were not visible so that the top values were unknown; opined that Isura's placement of asterisks in the figures was misleading, because it suggested comparisons that were not accurate; and demonstrated that the drawing of a simple vertical line rebutted Kababick's visual comparison of the peaks. As to the Eurofins data, Dr. Wang critiqued the report because it failed to disclose the method used for its additional GC testing. The Court cited all of the foregoing in weighing the testimony and relying on Dr. Wang. In sum, the District Court's factual finding was not "completely devoid of minimum evidentiary support displaying some hue of credibility" or without a "rational relationship to the supportive evidentiary data." *Berg Chilling Sys., Inc.*, 369 F.3d at 754 (quoting *Kool, Mann, Coffee & Co.*, 300 F.3d at 353). Far from it. Accordingly, there was no clear error.

## B. The District Court Did not Err in Entering Judgment for MTC on Jiaherb's Additional Claims

Jiaherb argues that if the District Court committed clear error in finding no adulteration, then it also erred in dismissing the Lanham Act claim and implied covenant claim. Both claims would require Jiaherb to prove, among other things, that MTC's product was adulterated as Jiaherb points to no other basis for falsity in violation of the Lanham Act, or bad faith or dishonesty in violation of the implied covenant. *See* 15 U.S.C. § 1125(a)(1)(B); *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 198 (3d Cir. 2014); *Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575, 589 (N.J. 1997). Having concluded that the District Court did not err in finding no adulteration, we hold that it also did not err in dismissing these claims.

\* \* \* \* \*

10

For the reasons set forth above, we will AFFIRM the order of the District Court.